IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

04 MAR 31  PM 4: 26

| | | |
|---|---|---|
| TREIBACHER INDUSTRIE, A.G., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. CV 01-B-2872-NE |
| | ) | |
| TDY INDUSTRIES, INC.; | ) | |
| ALLEGHENY TECHNOLOGIES, | ) | |
| INC., | ) | ENTERED |
| | ) | |
| Defendants. | | MAR 31 2004 |

## MEMORANDUM OPINION

This case is before the court on plaintiff's Motion for Summary Judgment, (doc. 31), and its Motion to Strike Defendant's Brief and Affidavit in Support of Summary Judgment, (doc. 35). Also before the court is defendants' Motion for Summary Judgment, (doc. 33), and their Motion to Strike the Affidavit of Robert Packer, (doc. 39). Plaintiff Treibacher Industrie, A.G., has sued defendant TDY Industries, Inc.,[1] and its parent corporation, defendant Allegheny Technologies, Inc., alleging breach of contract pursuant to the United Nations Convention on the International Sale of Goods ["CISG"] and breach of contract,

---

[1] Plaintiff also sued Teledyne Advanced Materials and Metal Working Products, which it contends was the previous name of Alldyne Powder Technologies. (Doc. 1, ¶ 3.) Subsequently, plaintiff filed a Motion to Amend its Complaint "to reflect TDY Industries, Inc., as the true party in interest for the erroneously named Alldyne Powder Technologies," which it contends is the "trade name of TDY Industries." (Doc. 9.) This Motion was granted. However, TDY Industries filed an Amended Answer, which states that it was "erroneously designated in Plaintiff's Complaint as 'Teledyne Advanced Materials and Metalworking Products.'" (Doc. 26.) The parties consistently refer to the two defendants in this case as Allegheny Technologies and TDY Industries. Therefore, any claims against defendant Teledyne Advanced Materials and Metal Working Products are due to dismissed.



unjust enrichment, conversion, and promissory fraud pursuant to Alabama law. Upon consideration of the record, the submission of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that defendants' Motion for Summary Judgment is due to granted in part and denied in part; plaintiff's Motion for Summary Judgment is due to be denied, defendants' Motion to Strike is due to be granted in part and denied in part; and plaintiff's Motion to Strike is due to be denied.

## I. SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of showing no genuine issue of material fact and that it is entitled to judgment as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and show that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Credibility determinations, the weighing of evidence, and the

drawing of inferences from the facts are left to the jury, and, therefore, evidence favoring the non-moving party is to be believed and all justifiable inferences are to be drawn in its favor. *See id.* at 255. Nevertheless, the non-moving party need not be given the benefit of every inference but only of every **reasonable** inference. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988). In resolving cross-Motions for Summary Judgment, "the court will construe the facts in the light most favorable to the nonmovant when the parties' factual statements conflict or inferences are required." *Moates v. Strength*, 57 F. Supp.2d 1305, 1307 (M.D. Ala. 1999)(citing *Barnes v. Southwest Forest Indus.*, 814 F.2d 607, 609 (11th Cir. 1987)).

## II. **STATEMENT OF FACTS**

Plaintiff Treibacher Industrie, A.G. was founded in 1898 and has established a history of metallurgical and technological advancements in the procurement, production, and refinement of ferroalloys, hard metal powders, and rare earth elements. Defendant TDY Industries, Inc., [hereinafter "defendant"], is a subsidiary of defendant Allegheny Technologies.[2] (Doc. 33, Ex. C at 47-48.) Defendant operates thirteen plants in six countries; one of its plants is in Gurley, Alabama. The Gurley plant produces tungsten

---

[2]Defendants contend, "Allegheny also was named as a defendant in the complaint, but there is no evidence of any dealings between Treibacher and Allegheny." (Defs. Br. in Supp. of Mot. for Summ. J., at 1.) However, defendants did not move for summary judgment to dismiss Allegheny Technologies, the parent corporation of TDY Industries, on the ground that the parent company cannot be held liable for the acts of its subsidiary.

3

graded carbide powders, a component of tantalum carbine ["TaC"] and tantalum and niobium carbide ["TaC 50/50" or "TaC/NbC 50/50"].

Plaintiff and defendant began doing business in 1993 or 1994. (Doc. 33, Ex. B at 11; doc. 33, Ex. C at 41.) Defendant used TaC and TaC 50/50, that it obtained from plaintiff, to manufacture metal powders for specific applications by its customers. (Doc. 33, Ex. C at 59, 78.) From the beginning of the parties' relationship until October 1997, the parties transacted business through an intermediary, Trinitech International, Inc, plaintiff's American agent. (Doc. 33, Ex. B at 11.)

During the period that it acted as plaintiff's agent, Trinitech would contact defendant to learn its needs for the upcoming period of time. (*Id.* at 11-12.) Trinitech forwarded this information to plaintiff. (*Id.* at 12-13.) Then plaintiff would inform Trinitech of "quantities, qualities, prices, [and] delivery times" it was offering to fill defendant's needs. (*Id.* at 15-16.) Trinitech communicated the terms to defendant. (*Id.* at 16-18.) If an order was placed, Trinitech communicated the order to plaintiff, and plaintiff would produce the material and ship it either to defendant or to Trinitech. (*Id.* at 18-20.)

When defendant received the material, it placed them in the so-called "consignment store," where the material was identified as plaintiff's property and kept separate from other material from other vendors. (Doc. 33, Ex. D at 10-11; doc. 33, Ex. C at 164.) Plaintiff did not send material to defendant's consignment store unless defendant requested it. (Doc. 33, Ex. C at 68.)

When defendant used material that plaintiff had shipped to its consignment store, defendant generated a usage report that reflected the amount withdrawn. (Doc. 33, Ex. A at 74.) This usage report was sent to Trinitech. (*Id.*) Trinitech forwarded the usage report to plaintiff, who then sent defendant an invoice for the amount of materials withdrawn from the "consignment store" at the offered price, which defendant would pay. (*Id.* 74; doc. 33, Ex. C at 83-84.)

After plaintiff terminated Trinitech as its agent, the parties' transactions continued in substantially the same form. (Doc. 33, Ex. A at 76.)

The parties agree that all material plaintiff sent to defendant was sent on "consignment." However, the term "consignment" is not defined in any document, and plaintiff and defendant did not discuss the meaning of the term. (Doc. 33, Ex. A at 125; doc. 33, Ex. B at 33.)

Ulf Stromberger, plaintiff's Managing Director of its business unit, testified that he understood "consignment" to mean a "certain billing system" where the material was stored at the customer's location and the customer paid for the material only when it was used. (Doc. 33, Ex. A at 121-22.) Stromberger testified that, in the past course of dealing with defendant, defendant used material plaintiff had shipped to it within a "reasonable period;" he testified that "*always* everything was used as agreed." (*Id.* at 133-34 (emphasis added).) Over the history of the parties relationship, defendant had used the material over a period of two to three months. (*Id.* at 134-35.) Defendant does not dispute plaintiff's evidence that it had always used all product sent to it within a two to three month period.

5

Robert Packer, Vice President of Tungste-Met and former Vice President and President of Ultra Met, has been employed in the hard metal industry for over 25 years. From 1993 until 1999, he was involved in purchasing hard metal powders from plaintiff on consignment. He described these purchasing agreements as follows: "Ultra-Met would agree to purchase a specific quantity of goods at a specific price and these goods would then be delivered on consignment terms. In each such case Ultra-Met was obligated to consume the goods ordered and to pay for the goods once consumed." (Doc. 38, Ex. 1.)

John Johnson, defendant's Vice President, testified that acquiring product "on consignment" is a common practice in the industry and that defendant had followed the industry practice for consignment agreements in dealing with plaintiff. (Doc. 33, Ex. C at 161.) Johnson testified that, in accordance with industry practice, defendant had no obligation to pay for the product contained in plaintiff's consignment store unless and until it was used. (*Id.* at 138-40.) Johnson testified that plaintiff had the right to withdraw the materials from the consignment store. (*Id.* at 145-47.) However, the parties did not have a written or verbal agreement allowing defendant to return unused goods. (*Id.* at 146-47.)

Charles Weiser worked for over 20 years as Director of Sales for HC Starck, Inc., the world's largest producer of tantalum and a competitor of the plaintiff. (Doc. 33, Ex. E.) Weiser testified that the consignment system is used extensively in the hard metal industry. (*Id.*) He testified that, within the hard metal industry, "consignment" means:

> The product is delivered to the customer or consignee who keeps it safe in a consignment inventory. All product in the consignment inventory remains the property of the consignor or supplier until it is used. The consignor has the

6

right to remove the material from the consignment inventory before it is used by the consignee or customer if the consignor chooses to do so. The customer uses the product as it is needed. The customer purchases the product when it is removed from the consignment inventory. ***The customer has no obligation to buy consigned product at any time before the product is removed from the consignment inventory.*** When product is removed from the consignment inventory for use, the consignor or supplier invoices the customer and the customer pays for the product.

(*Id.* (emphasis added).) Weiser further testified, "If consigned material or product was not delivered to or used by the customer, there was no sale and the customer would not be liable for the cost of the unused product." (*Id.*)

The present dispute involves transactions that occurred in November and December 2000.

In the fall of 2000, the availability of tantalum oxide, the raw material used to make TaC and TaC 50/50, became scarce and the cost of TaC and its derivatives increased. During this time, defendant was in urgent need of the material. (Doc. 32, Ex. 4.) Also, during this time frame, defendant and plaintiff began discussions regarding defendant's need for TaC and TaC 50/50 in 2001. On November 8, 2000, plaintiff received word there was some raw material available from Hi-Temp Specialty Metals. (Doc. 32, Ex. 3.) On November 10, 2000, Peter Hinterhofer, who was plaintiff's employee responsible for American sales, offered to defendant the TaC that would be produced from this raw material. (Doc. 32, Ex. 4.) This e-mail states:

> As far as next year[']s business is concerned I could provide 1000 kgs of TAC/NbC 50/50 and 500 kgs of TaC for mid/end Jan. arrival. I need [$] 492.50/kg [and] [$] 925.00/kg [respectively] for which I need your confirmation [by] Mon. next week . . . .

7

> In addition to the above, I'm working on another raw material lot out of which I expect to able to provide 1,000 kgs of TaC/NbC 50/50 and 400 kgs of TaC at the same price as mentioned above. Shipment might be for Feb. arrival. Again I need your confirmation [by] Mon. next week . . . that you will accept the prices, although this is subject to reconfirmation from my side.
>
> Finally, I want to make you aware once again that the prices for Ta raw materials are increasing every day and that, if you decide not to accept the above prices, it could be that I will not be able to supply you any quantity during Jan./Feb. 2001, even not at a higher price.

(Doc. 32, Ex. 6.) On that same day, November 10, 2000, Hinterhofer sent a message to Hi-Temp confirming the raw materials would be held at a fixed price until November 14, 2000, so that plaintiff might be able to obtain a decision from defendant. (Doc. 32, Ex. 5.) On November 14, 2000, defendant's employee, Conrad Atchley, e-mailed plaintiff, stating "I agree with the shipment's [sic] below, and also for the 1.6 ton of choice in [F]eb., [M]ar., and [A]pr. 2000." (Doc. 32, Ex. 7.) On the same day, November 14, 2000, plaintiff placed with Hi-Temp the order for the raw material necessary to fulfill the agreement with defendant, and Hi-Temp issued its sales order to plaintiff for the raw material. (Doc. 32, Ex. 8.) The entire purchase was shipped to plaintiff for production.

On December 6, 2000, Hi-Temp communicated to plaintiff the availability of a second and separate lot of material necessary to produce TaC. (Doc. 32, Ex. 9.) On December 7, 2000, Hi-Temp e-mailed confirmation of the offer to plaintiff and stated that such would be held open until December 13, 2000; this deadline was later extended to December 15, 2000. (Doc. 32, Exs. 9 and 10.) In December 2000, Atchley had discussed the availability of 2000 kilograms of TaC with Hinterhofer. (Doc. 32, Hinterhofer depo. at 82-85; *id.*, Atchley depo.

at 65.) On December 15, 2000, Hinterhofer confirmed his telephone conversation with an e-mail to Atchley, which stated:

> [F]ollowing our phone conversation yesterday I'd like to put down that you confirmed to *purchase* 2,000 kgs of TaC contained in the quality (pure, 50/50, etc.) of your choice for May, June, and July 2001 arrival.
>
> Price: [$]1,100.00/kg for TaC . . ., [$] 580.00 for TaC/NbC 50/50
>
> Please let me know as soon as possible which quality you will need because this is very important for our production/capacity planning.

(Doc. 32, Ex. 11 (emphasis added).) Also, on December 15, 2000, plaintiff placed with Hi-Temp the order for purchase of raw materials necessary to satisfy the terms of its agreement with defendant. (Doc. 32, Ex. 14.)

From these transactions, plaintiff shipped to defendant 2,000 kilograms of TaC 50/50 and 500 kilograms of TaC, which in turn were accepted by defendant. (Doc. 32, Stromberger depo. at 174-75.) Plaintiff did not deliver the remaining 2000 kilograms of TaC 50/50 from Deal 2. (*Id.* at 175.)

The market prices for TaC went down in 2001. Defendant acquired TaC for $684 per kilogram and $683.55 per kilogram from sources other than plaintiff. (Doc. 32, Johnson depo. at 178, 180-81.) Defendant also decided to acquire the raw material and manufacture its own TaC. (*Id.* at 183-85.) It acquired at least 6,917 kilograms from March to September 2001. (*Id.* at 183.)[3]

---

[3]John Johnson, defendant's Vice President, testified that defendant received 6,917 kilograms of tantalum oxide from ELG Metals between May and September 2001. (Doc. 32, Johnson depo. at 183.) He also testified that defendant obtained tantalum oxide from

Defendant has not ordered any material from plaintiff since December 15, 2000. (Pl. Br. in Opp. to Def. Mot. for Summ. J., Johnson Depo. (attached) at 162-63.) Also, defendant has not used any of the material received from plaintiff as a result of the November 2000 transaction. (Doc. 33, Ex. C at 254.)

### III. DISCUSSION

A. **PLAINTIFF'S MOTION TO STRIKE AFFIDAVIT OF CHARLES WEISER**

Plaintiff has moved to strike the affidavit of Charles Weiser on the ground that Weiser's expert opinion testimony is not reliable, and on the ground that his testimony constitutes an improper legal conclusion. (Doc. 35.) The court notes that, although labeled an "affidavit" in defendant's evidentiary submission, Weiser's statement is actually entitled, "Expert Report of Charles William Weiser." (Doc. 33, Ex. E.)

In this circuit –

> A three-pronged test controls the determination of whether expert opinion evidence is admissible. Admission is proper if "(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in [*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)]; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue."

---

Minmetals, Powmet, and S&N (USA), Inc. in March 2001, from which defendant manufactured TaC; however, the record does not contain any evidence as to the amount of tantalum oxide obtained from these sources. (*Id.* at 184-85.)

*Hudgens v. Bell Helicopters/Textron*, 328 F.3d 1329, 1338 (11th Cir. 2003) (quoting *City of Tuscaloosa v. Harcros Chem., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998)).

Weiser's testimony regards the meaning of the word "consignment" as the term is used in the "hard metals" product industry. He contends that, when a sale is made on consignment, "[t]he customer has no obligation to buy consigned product at any time before product is removed from the consignment inventory." (Doc. 33, Ex. E at 1-2.) His testimony is based on his experience in marketing hard metal products for over twenty years. The court finds that Weiser's testimony as to the trade usage of the word "consignment" is relevant and reliable based on his extensive experience.

Also, the court finds that Weiser's testimony regarding the trade usage of "consignment" is not a legal conclusion because trade usage is a question of fact. *See Pennzoil Co. v. F.E.R.C.*, 789 F.2d 1128, 1143 ("Usage of trade is a question of fact." (citing U.C.C. § 1-205(2))), *cited in Voest-Alpine Trading USA Corp. v. Bank of China*, 288 F.3d 262, 265 (5th Cir. 2002); Restatement (Second) of Contracts § 222 ("The existence and scope of a usage of trade are to be determined as questions of fact.").

Based on the foregoing, plaintiff's Motion to Strike is due to be denied.

## B. DEFENDANTS' MOTION TO STRIKE AFFIDAVIT OF ROBERT PACKER

Defendants move to strike Robert Packer's Affidavit on the ground that plaintiff did not disclose Packer as an expert witness until after the close of discovery. Plaintiff contends Packer's Affidavit is offered to rebut Weiser's testimony regarding the trade usage of the word "consignment," which it contends was not an issue until summary judgment.

Moreover, it contends that Packer is not a retained expert, but is a fact witness as to his course of dealing with plaintiff on a "consignment basis."

Rule 26(a)(2) requires a party to disclose as an expert witness "any person who may be used at trial to present evidence under Rules 702, 703, or 705 of the Federal Rules of Evidence." Fed. R. Civ. P. 26(a)(2)(A). Such expert witness disclosures "shall be made at the times and in the sequence directed by the court. . . . [I]f the evidence is intended solely to contradict or rebut evidence on the same subject matter identified by another party under paragraph (2)(B), within 30 days after the disclosure made by the other party." Fed. R. Civ. P. 26(a)(2)(C).

Parker's Affidavit was signed on February 28, 2003; it was served on plaintiff on or about March 5, 2003. Weiser's Expert Report was disclosed on or about October 25, 2002; more than 30 days before Parker was disclosed as a witness. Thus, the court finds that plaintiff did not disclose Parker within the time allowed by Fed. R. Civ. P. 26(a)(2)(C) for disclosure of rebuttal expert witnesses. Defendants' Motion to Strike Parker's Affidavit is due to be granted as to Parker's opinion testimony, which is paragraph 5 of his affidavit.[4]

---

[4]This paragraph states:

> Consignment is a system whereby the manufacturer can ship large quantities of powder and the buyer does not have to pay for the goods until used. The quantity and price of the goods are agreed upon prior to shipment and the buyer is obligated to consume and pay for the goods ordered.

(Doc. 38, Ex. 1.)

The Motion to Strike is due to be denied as to the remainder of Parker's Affidavit, which is based on his personal knowledge of the consignment transactions between his employer and Treibacher.

## C. MOTIONS FOR SUMMARY JUDGMENT

### 1. CISG Claim – Breach of Contract

#### a. Transactions are Covered by the CISG

Plaintiff contends that the November and December transactions are covered by the United National Convention on Contracts for the International Sale of Goods ["CISG"]. The CISG "applies to contracts of sale of goods between parties whose places of business are in different States: (a) when the States are Contracting States . . .". *See* CISG art. 1(1)(a); *see also MCC-Marble Ceramic Center, Inc. v. Ceramica Nuova D'Agostino, S.P.A.*, 144 F.3d 1384, 1386 (11th Cir. 1998), *cert. denied* 526 U.S. 1087 (1999). Plaintiff's place of business is in Austria; defendant's place of business is the United States of America. Also, the CISG "governs . . . the formation of the contract of sale and the rights and obligations of the seller and the buyer arising from such a contract." CISG art. 4. Whether the parties' November and December 2000 transactions formed a contract for the sale of goods is the issue in this case. Therefore, the court finds that the CISG governs this matter.

#### b. Intent of the Parties

The dispositive issue in this case is what was the subjective intent of the parties regarding the November and December transactions. *See MCC-Marble Ceramic Center, Inc. v. Ceramica Nuova D'Agostino, S.P.A.*, 144 F.3d at 1387. Defendant contends that there was

no sale because the goods were sent on "consignment," which it contends means something akin to a bailment. Thus, it argues nothing was "sold" until defendant removed the material from the consignment store and used it. However, plaintiff contends that there was a sale because "over the years" defendant had always purchased and used all material sent by plaintiff, and the use of the term "consignment" was merely a description of the method of delivery and payment.

The CISG provides the following regarding the interpretation of a sales agreement:

Article 8
    (1) For purposes of this Convention statements made by and other conduct of a party are to be interpreted according to his intent where the other party knew or could not have been unaware what that intent was.

. . .

    (3) In determining the intent of a party or the understanding a reasonable person would have had, due consideration is to be given to all relevant circumstances of the case including the negotiations, any practices which the parties have established between themselves, usages and any subsequent conduct of the parties.

Article 9

    (1) The parties are bound by any usage to which they have agreed and by any practices which they have established between themselves.

    (2) The parties are considered, unless otherwise agreed, to have impliedly made applicable to their contract or its formation a usage of which the parties knew or ought to have known and which in international trade is widely known to, and regularly observed by, parties to contracts of the type involved in the particular trade concerned.

CISG art. 8(1),(3) and art. 9.

"The plain language of the [CISG] requires an inquiry into a party's subjective intent as long as the other party to the contract was aware of that intent." *MCC-Marble Ceramic Center*, 144 F.3d at 1387. The CISG provides that the court consider "all relevant circumstances of the case including the negotiations, any practices which the parties have established between themselves, usages and any subsequent conduct of the parties" to determine the intent of the parties. CISG art. 8(3).

In this case, plaintiff contends that it "intended" the November and December transactions to be a sale. Its position is supported by the negotiations and the past practices of the parties. However, defendant contends that there was no sale intended unless and until it used the material that was the subject of the November and December transactions, and it did not have an obligation to ever use the material. This position is supported by defendant's evidence.

The court finds disputed issues of material fact regarding the parties' intent and whether such intent was known to the opposing party at the time of the transaction. Therefore, the parties' Motions for Summary Judgment are due to be denied as to plaintiff's CISG breach of contract claim.

**2. State Law Claims**

 **a. Fraud**

Defendant contends that plaintiff cannot establish that, at the time of the November and December 2000 transactions, it did not intend to purchase the material. However, plaintiff argues:

15

>       Regardless of the fact that TDY knew Treibacher was relying on their order and was acquiring raw material to fill the contract, TDY was simultaneously looking to obtain the material elsewhere. TDY began pricing the raw material in November and December 2000 so that it could more cheaply produce its own TaC. [(Doc. 38, Atchley depo. at 110-11; doc. 38, Johnson depo. at 174-75.)] TDY never told Treibacher of this intent. [(Doc. 38, Johnson depo. at 175.)] In fact, TDY used an intermediary company to bid on [raw] materials in order "to conceal [its] identity. [(Doc. 38, Ex. 5.)].

(Doc. 38 at 9.) Defendant, in reply, contends only that "Treibacher has made no serious attempt to establish that Alabama case law would support an argument that Treibacher's evidence remotely satisfies the rigorous standard applicable to claims for promissory fraud." (Def. Reply in Supp. of Mot. for Summ. J. at 10.) The court disagrees with defendant's contentions.

Under Alabama law, "[a] claim of promissory fraud requires proof of six elements: (1) a false representation, (2) of a material existing fact, (3) that is justifiably relied upon by the plaintiff, (4) that causes damage to the plaintiff as a proximate result of the reliance, (5) 'proof that at the time of the misrepresentation, the defendant had the intention not to perform the act promised,' and (6) 'proof that the defendant had an intent to deceive.'" *Triple J Cattle, Inc. v. Chambers*, 621 So.2d 1221, 1224 (Ala. 1993)(quoting *Padgett v. Hughes*, 535 So.2d 140, 142 (Ala. 1988)). The evidence, viewed in the light most favorable to plaintiff, establishes that defendant promised to purchase the materials and, in reliance on such promise, plaintiff acquired certain raw materials. Moreover, the record contains evidence from which a reasonable jury could find that defendant did not intend to purchase the material from plaintiff if it could find it at a cheaper price and that it was planning to

begin manufacturing the material itself within the time set for delivery of the material. Therefore, a reasonable jury could infer that defendant agreed to purchase the material, but it only intended to purchase the material if it could not be found from another source at a cheaper price or if it was needed before defendant was ready to begin manufacturing the material itself – contingencies that were not disclosed to plaintiff.

The Alabama Supreme Court has held that a promise to perform based on an undisclosed contingency, which is intended to induce reliance upon the promise, is sufficient evidence to allow a jury to infer the intent required to support a promissory fraud claim. *Hillcrest Center, Inc. v. Rone*, 711 So.2d 901, 905-06 (Ala. 1997).[5] Based on the evidence before it, the court finds a disputed issue of material fact exists as to plaintiff's promissory fraud claims and therefore, defendant is not entitled to judgment as a matter of law. Defendant's Motion for Summary Judgment as to plaintiff's promissory fraud claim will be denied.

---

[5]The Alabama Supreme Court held:

> Taking the testimony of all the witnesses as a whole, we conclude that the evidence was sufficient for the jury to infer that Seibert intended, from the beginning, to induce the Rones to execute the lease contract, yet never intended to purchase the adjacent lot to provide the additional parking unless she was able to secure a tenant for the proposed building to be built on the adjacent lot (a "contingency' Seibert never communicated to the Rones), despite her continued assurances to the Rones that there would be "plenty of parking." The evidence was sufficient for the jury to infer that Seibert's conduct toward the Rones exhibited the intent required for a finding of promissory fraud.

*Hillcrest Center, Inc.*, 711 So.2d at 906.

### b. Remaining State Law Claims

Plaintiff has not presented the court with any evidence or argument in opposition to defendant's Motion for Summary Judgment as to its remaining state-law claims. Therefore, the court finds that plaintiff has abandoned these claims. *See Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir.)("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." (citing *Road Sprinkler Fitters Local Union No. 669 v. Indep. Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir.1994); *Blue Cross & Blue Shield v. Weitz*, 913 F.2d 1544, 1550 (11th Cir.1990))); *cert. denied* 516 U.S. 817 (1995). Defendant's Motion for Summary Judgment is due to granted as to plaintiff's remaining state-law claims, and such claims are due to be dismissed.

## IV. CONCLUSION

For the foregoing reasons, the court is of the opinion that there are issues of material facts in dispute; that neither party is entitled to judgment as a matter of law on plaintiff's breach of contract claim pursuant to the CISG; and that defendant is not entitled to judgment as a matter of law on plaintiff's state-law promissory fraud claim. Plaintiff has abandoned its remaining state law claims; therefore, defendant's Motion for Summary Judgment is due to be granted as to such claims and such claims will be dismissed. Defendant's Motion to Strike the affidavit of Robert Packer is due to be granted in part and denied in part. The

Motion to Strike will be granted as to Packer's testimony based on his expert opinion, and denied as to his testimony based on his experience in dealing with plaintiff, which the court has considered in deciding the parties' Motions for Summary Judgment. Plaintiff's Motion to Strike the expert report of Charles Weiser is due to be denied; the court has considered Weiser's opinion testimony in deciding the parties' Motions for Summary Judgment.

An order denying plaintiff's Motion for Summary Judgment, (doc. 31), denying plaintiff's Motion to Strike, (doc. 35), denying in part and granting in part defendants' Motion to Strike, (doc. 39), granting in part and denying in part defendant's Motion for Summary Judgment, (doc. 33), and dismissing plaintiff's state-law claims of breach of contract, unjust enrichment, and conversion will be entered contemporaneously with this Memorandum Opinion.

**DONE** this 31st day of March, 2004.

*Sharon Lovelace Blackburn*
**SHARON LOVELACE BLACKBURN**
United States District Judge