UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| TREIBACHER INDUSTRIE, A.G., | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: CV-01-HS-2872-NE |
| | ) | |
| TDY INDUSTRIES, INC., | ) | |
| Defendant. | ) | |

## MEMORANDUM OF DECISION

This is a diversity action for breach of contract and fraud arising out of an agreement to deliver certain hard metal powders ("materials") with an aggregate value in excess of Five Million Dollars ($5,000,000.00).  The plaintiff, Treibacher Industrie, A.G. ("Treibacher"), is an Austrian corporation with its principal place of business in Austria.  The defendant, TDY Industries, Inc. ("TDY"), is a California corporation with its principal place of business in California.  The events giving rise to the action took place in Madison County, Alabama.

The parties have a course of dealing extending back to 1994.  Treibacher's complaint for breach of contract and fraud contends TDY ordered certain hard metal powders, more fully described later, in November and December, 2000, but refused to pay for the materials.  Treibacher also contends that TDY ordered the materials knowing that if TDY could locate cheaper replacement goods, TDY would not honor

its purchase commitment.   Treibacher sought to contend that TDY continued to misrepresent to Treibacher that TDY would honor its commitment and that, as a result of such continuing misrepresentations, Treibacher did not take steps to sell the goods elsewhere.[1]   Treibacher claims damages of $5,361,500.00 for breach of contract and fraud, less $919,458.00 obtained by resale of the ordered goods, for actual damages of $4,442,042.00, plus interest.

The case was tried *ore tenus* on February 22, 23, and 24, 2005.   Pursuant to Rule 52, Fed.R.Civ.P., the Court now finds the facts specially[2] and states separately its conclusions of law thereon, making all necessary determinations of credibility of witnesses where trial testimony conflicted.

<u>FINDINGS OF FACT</u>

**A.**      ***The Parties*.**

Treibacher is an Austrian company founded in 1898.   It has established a history in the procurement, production and refinement of ferroalloys, hard metal powders and rare earth elements.   TDY is a subsidiary of Allegheny Technologies.

---

[1]  This claim was sought to be added by amendment to conform to the evidence, F.R.Civ.P. 15(b).  The court granted the motion to amend at trial, but by separate Order entered simultaneously herewith, vacates that order because the court was wrong to allow the amendment.

[2]  The Court's factual findings are based on its observations of the witnesses, the documents admitted into evidence, and its trial notes.

TDY operates thirteen (13) plants in six (6) countries; one of its plants is located in Gurley, Alabama.  The Gurley plant produces Tungsten graded carbide powders, a component of which is Tantalum Carbide ("TaC") and Tantalum Niobium Carbide ("TaC/NBC 50/50 or TaC 50/50").  Treibacher would provide to TDY hard metal powders including TaC and TaC 50/50 to be used in TDY's production of its graded powders.

>   **B.**   ***History of the Relationship.***

In 1991, Treibacher entered into a consignment stock agreement with a U.S. Company, Trinitech International, Inc. ("Trinitech"), whereby Trinitech was to act as the sales agent of Treibacher. (Plaintiff's Ex. 1; Testimony of Peter Hinterhofer)  Any withdrawal of goods by Trinitech was to be done only on the basis of a separately agreed sales contract. (Plaintiff's Ex. 1; Testimony of Peter Hinterhofer)  In return for Trinitech obtaining these agreed sales contracts, it was paid a commission. (Plaintiff's Ex. 2; Testimony of Peter Hinterhofer)  At all times, Treibacher controlled the price at which the goods could be sold.  (Testimony of Peter Hinterhofer)

In 1993, Trinitech, as an agent for Treibacher, developed a relationship with TDY where Treibacher would manufacture materials for Treibacher.  Trinitech and TDY would discuss TDY's materials needs for an upcoming period of time, Trinitech would forward this information to Treibacher, and Treibacher would inform

Trinitech of quantity, quality, prices and delivery terms it was offering to fill TDY's needs. Trinitech would communicate these terms to TDY. If TDY ordered materials, Trinitech communicated the order to Treibacher who would produce the materials and ship them either to TDY or to Trinitech. (Testimony of Peter Hinterhofer and Robert Wiley) TDY at no time supplied to Treibacher any raw materials needed for Treibacher's production of TDY's orders. (Testimony of John Johnson and Peter Hinterhofer)

When TDY received Treibacher materials, it placed them in a "consignment store" where the materials were labeled as Treibacher's property and kept separate from other vendors' material. (Testimony of Robert Wiley and Peter Hinterhofer)

When TDY used Treibacher materials from its consignment store, TDY generated a usage report showing the amount withdrawn. The usage report was sent to Trinitech, which forwarded it to Treibacher, which sent TDY an invoice for the amount of materials withdrawn from the consignment store at the offered price. TDY would pay this invoice. (Testimony of Robert Wiley, John Johnson, and Peter Hinterhofer)

In 1997, Treibacher terminated its agency relationship with Trinitech and began dealing directly with TDY. (Plaintiff's Ex. 3; Testimony of Peter Hinterhofer) The transactions between Treibacher and TDY continued in substantially the same

4

form.  (Testimony of Robert Wiley)

The parties agree that all materials Treibacher sent to TDY were sent on "consignment".  However, the term was not defined in any document, and there is no evidence of the meaning of the term as an agreed or negotiated term between the parties.  Treibacher contends that the term was a billing term only, and meant that invoices would be delayed until after TDY withdrew (used) the materials.  TDY contends that the term meant that no sale occurred unless and until TDY withdrew the materials.  The Court heard conflicting testimony regarding the meaning of the term in the industry.  (Testimony of Charles Weiser and deposition testimony of Robert Packer)  However, TDY's corporate representative testified that "consignment agreements" were individually negotiated.  (Testimony of John Johnson) The Court finds that consignment was reasonably understood by these parties to mean that a sale had occurred, but that invoices would be delayed until the materials were withdrawn, within some reasonable time after delivery, as mutually agreed between the parties. (Testimony of Ulf Strumberger).  The Court also finds that the course of dealing between these parties, supports the meaning ascribed by Treibacher to the term. Particularly, the Court is persuaded that the (undisputed) incident in February, 2000, when TDY tried to return some unused materials to Treibacher but Treibacher refused to accept such return on the basis that the goods had been specially ordered and sold

5

to TDY, and TDY acquiesced in Treibacher's position, using the materials and paying for them, supports the meaning ascribed by Treibacher.  (Plaintiff's Exhibit 27; Testimony of Peter Hinterhofer and Conard Atchley)

The Treibacher materials TDY acquired were intended to be used in TDY's manufacturing process and were never intended to be marketed to a third party. There was no particular method by which the materials had to be used, i.e., first in first out (FIFO); TDY could use the materials in any order it saw fit.  There was no restriction on TDY as to how it could utilize the Treibacher materials.  Once TDY used the materials in the production of TDY's graded powders, Treibacher had no input into the pricing of TDY's product and had no right to an accounting of the sale of that product.  If any profit was made by TDY in the sale of its finished product, it kept those profits and was only responsible to pay Treibacher the agreed price for the materials Treibacher had furnished that TDY had used.  There was no segregation of funds of TDY upon the sale of its product.  TDY received no commission from the use or sale of Treibacher's product.  (Testimony of John Johnson)  TDY's only responsibility upon use was to pay the agreed price.  (Testimony of John Johnson and Peter Hinterhofer)

C.    *The Practices of the Parties*.

The relationship between TDY and Treibacher began in 1993, with Trinitech

as the intermediary sales agent for Treibacher.  In one of the first transactions, TDY issued to Trinitech its Blanket Purchase Order #16654 for the acquisition of TaC 50/50 at $38.00 per pound.  These materials were to arrive on consignment.  In this order, the quantity was open but the price was fixed.  (Plaintiff's Ex. 4)

In 1994, Trinitech submitted, and TDY executed, a Purchase Sales Contract #1432054 whereby TDY agreed to purchase from Treibacher 600 kilograms of TaC at $56.00 per pound.   Under delivery terms, materials were to be sent to "consignment" with an immediate delivery to consignment of 200 of the 600 kilograms.  (Plaintiff's Ex. 5A-P)  The documentary evidence then shows delivery, consumption, usage reports to Trinitech, and invoices to TDY by Treibacher.  This type contract with delivery into consignment, subsequent usage, and invoicing is seen throughout the relationship of the parties.  (Testimony of Peter Hinterhofer and Robert Wiley )

As another example, in 1995, TDY issued its Blanket Purchase Order #20GU1 for 20,000 pounds of TaC 50/50 at $38.00 per pound and 1,500 pounds of TaC at $56.00 per pound to be "consigned to Gurley, Alabama."  Treibacher agreed to accept the order on April 19, 1995.  (Plaintiff's Ex. 6)  Trinitech considered Blanket Purchase Order #20GU1 to be a "fixed contract" as evidenced by its communication to Treibacher dated September 19, 1995.  (Plaintiff's Ex. 7)

In 1996, TDY, through Trinitech, inquired about pricing for the first quarter of 1996. (Plaintiff's Ex. 9)  In response, Treibacher issued its memorandum entitled "Sales," stating its terms for prices and quantities through the first quarter. (Plaintiff's Ex. 10)  TDY then issued its Blanket Purchase Order #115GU1 incorporating the terms of Treibacher's memorandum whereby it agreed to acquire a fixed quantity of materials for a fixed price. (Plaintiff's Ex. 11)

Business in 1997 was conducted much the same as in 1996.  TDY and Trinitech were in contact regarding pricing for the upcoming year (Plaintiff's Ex. 12), and Treibacher responded with price quotes. (Plaintiff's Ex. 13) Trinitech then reached an agreement with TDY where Trinitech related to Treibacher that TDY "Will issue a purchase contract for the first quarter only since that is simpler for Harold Wiley as relates to paperwork and also that's the period for which we [Treibacher] can quote a firm price." (Plaintiff's Ex. 14) TDY issued four (4) purchase orders for the year 1997. (Plaintiff's Ex. 15)

In 1998, agreements were made by which prices were agreed, quantities were requested (Plaintiff's Ex. 16), Blanket Purchase Orders were issued (Plaintiff's Ex. 17A-B), and the goods were shipped, used, reported on usage reports, and invoiced. (Testimony of Peter Hinterhofer)

Transactions in 1999 show much the same course of conduct and also show a

practice between the parties whereby agreements were reached by telephone on a quantity and price for an extended period. (Plaintiff's Ex. 18) The course of dealing is shown by Treibacher, following its confirmation of quantities and prices, stating "Other details as usual, i.e. delivery on consignment, the consignment inventory to be approximately a 1-2 months consumption." Following this confirmation by Treibacher, TDY issued its Blanket Purchase Orders #68890, 68891 and 68892 reflecting the quantity and price confirmed by Treibacher. (Plaintiff's Ex. 19A-D)

Throughout, once agreement was reached, Treibacher was obligated to deliver, and TDY was obligated to use and pay for, the agreed quantities of materials at the agreed prices. Terms could be changed only by mutual agreement. (Testimony of Peter Hinterhofer)

The year 2000 started out as in 1999. Treibacher quoted prices for the year by memo dated November 26, 1999, and warned TDY of increasing prices. (Plaintiff's Ex. 20) The parties spoke by telephone on December 20, 1999, when TDY ordered 2,400 kilograms of TaC at $175.00 per kilogram and 6,500 kilograms of TaC 50/50 at $117.50 per kilogram. The confirmation stated, "Other details as usual, i.e. delivery on consignment, etc.". (Plaintiff's Ex. 21) The materials were delivered to, used by, invoiced to, and paid by TDY. (Peter Hinterhofer testimony)

In addition to the 2000 orders above, additional materials were ordered

(Plaintiff's Ex. 22A-D) and delivered.   Under Purchase Order #114665, 500 kilograms of TaC at a price of $550.00 per kilogram were ordered and shipped as Lot #6445. (Plaintiff's Ex. 23) Three Hundred (300) kilograms of these materials remain in the consignment inventory at TDY.   (Plaintiff's Ex. 25; Testimony of Peter Hinterhofer)

Under Purchase Order #111980GU1, 500 kilograms of the hard metal powder NBC/CBS at $60.00 per kilogram were ordered and delivered as Lot #4474. (Plaintiff's Ex. 24) One Hundred Fifty (150) kilograms of these materials remain in the consignment inventory at TDY.   (Plaintiff's Ex. 25; Testimony of Peter Hinterhofer)

Also during 2000, TDY ordered (Plaintiff's Ex. 21; Plaintiff's Exhibit 26) and Treibacher had delivered a hard metal powder described as TICN 70/30 and TICN 50/50.  On February 24, 2000, TDY sent an e-mail expressing its desire to return this product.  By telephone call of the same date, Treibacher explained to TDY that the material had been supplied at TDY's request and TDY could not return it.  (Plaintiff's Ex. 27; Testimony of Peter Hinterhofer)  Following this conversation, the TICN was used by TDY and a usage report was sent to Treibacher.  (Plaintiff's Ex. 28A-B)  This interaction is consistent with the testimony of the parties that there was no agreement allowing the return of goods ordered by TDY.  (Testimony of Peter Hinterhofer,

10

Conard Atchley, and John Johnson)

Toward the end of 2000, TDY's consumption of Treibacher TaC and TaC 50/50 had exceeded the amount originally ordered.  (Plaintiff's Ex. 22B; Testimony of Peter Hinterhofer) With increased consumption of raw materials in the market, raw materials were becoming scarce and prices were increasing.  (Peter Hinterhofer testimony)  It was against this backdrop that the parties began their negotiations for the upcoming year.

**D. *Deal I.***

On November 8, 2000, Treibacher located a source of tantalum oxide from which it could produce TaC.  (Plaintiff's Ex. 29A) On November 10, 2000, it sought from its supplier confirmation of a price on 1,000 kilograms of that material and sought a commitment to keep that offer open until November 14, 2000, so that it could obtain a commitment from TDY.  (Plaintiff's Ex. 29B; Peter Hinterhofer testimony)  Immediately following receipt of this commitment, Treibacher made an offer to TDY to provide the TaC that could be produced from this raw material and sought TDY's confirmation that it would accept the prices.  (Plaintiff's Ex. 30; Peter Hinterhofer testimony)

Following the November 10, 2000, e-mail from Treibacher to TDY, Treibacher received word of additional materials that were available and offered TDY TaC from

those additional materials.  Treibacher told TDY that it would not order the materials without TDY's firm commitment.  (Plaintiff's Ex. 31; Peter Hinterhofer testimony)

On November 14, 2000, TDY e-mailed its response that it agreed with the shipments as offered in Treibacher's e-mail and also agreed to the 1.6 tons of choice in February, March, and April, 2000.  (Plaintiff's Ex. 32; John Johnson testimony) Treibacher then ordered the raw materials from its supplier at a cost of $2,530,864.44. (Plaintiff's Ex. 33A-C; Peter Hinterhofer testimony)

The following day, November 15, 2000, Treibacher sent an e-mail to TDY confirming TDY's agreement to the prices contained in Treibacher's prior e-mail and confirming quantities totaling 2,000 kilograms of TaC/NBC 50/50 and 2,100 kilograms of TaC. (Plaintiff's Ex. 34; Peter Hinterhofer and John Johnson testimony)

TDY issued its Purchase Orders #116766, 116767 and 118708 for 500 kilograms of TaC at the agreed price of $925.00 per kilogram and 2,000 kilograms of TaC 50/50 at the agreed price of $492.50 per kilogram.  (Plaintiff's Ex. 35, 36 and 37 respectively)   Treibacher has referred to this transaction as Deal I.   (Peter Hinterhofer testimony)

E.     *Deal II.*

On December 7, 2000, Treibacher located additional raw materials from which it could produce TaC.  Treibacher's supplier gave Treibacher until December 13,

2000, to place this order (Plaintiff's Ex. 39A); the deadline was verbally extended by telephone the same day.  (Plaintiff's Ex. 39B; Peter Hintehofer testimony) Treibacher offered the 2,000 kilograms of TaC it could produce from this raw material to TDY at a price of $1,100.00 per kilogram or, at TDY's choice, niobium carbide could be mixed with the TaC to make TaC 50/50 which would be sold at a price of $580.00 per kilogram.  Again, Treibacher told TDY that Treibacher would not purchase the materials without TDY's firm commitment.  (Testimony of Peter Hinterhofer)

TDY accepted Treibacher's offer by telephone on December 14, 2000.  The next day, December 15, 2000, Treibacher sent a confirmation stating, "Following our phone conversation yesterday I would like to put down that you confirmed to purchase 2,000 kilograms of TaC…".  This confirmation also quoted the price as being $1,100.00 per kilogram.  (Plaintiff's Ex. 40)  TDY did not respond to this confirmation.  (Testimony of Conard Atchley, Peter Hinterhofer) TDY's failure to respond was not unusual.  (Testimony of Peter Hinterhofer)

Following this confirmation, also on December 15, 2000, Treibacher placed its order for the raw material needed to produce the TaC for a cost of $1,543,209.85. (Plaintiff's Ex. 41; Peter Hinterhofer testimony)  Treibacher has referred to this transaction as Deal II.

13

**F.**   *Post Deal Communications.*

Following these transactions, Treibacher contacted TDY seeking instructions

as to the type (TaC vs. TaC 50/50) and quantity of material TDY needed delivered out

of Deal I and Deal II.  A partial delivery was made out of Deal I. (Plaintiff's Ex. 42;

Testimony of Peter Hinterhofer)   As to Deal II, Treibacher sought TDY's

specifications as to type of material and delivery dates but TDY never responded.

(Plaintiff's Ex. 43) The Deal II materials were never delivered.  (Testimony of Peter

Hinterhofer)

Treibacher sent TDY follow-up e-mails on February 8, 2001, and June 5, 2001.

TDY remained silent.  (Plaintiff's Ex. 43 and 44; Peter Hinterhofer testimony)  On

June 26, 2001, Treibacher sent TDY another e-mail (Plaintiff's Ex. 45), to which TDY

responded, "I am still looking into the matter but with what I know now this amount

will stretch into next year."  (Plaintiff's Ex. 46; Testimony of John Johnson) At no

point during this process, where the parties exchanged e-mails and letters, did TDY

refute or dispute the terms of the agreements designated Deal I and Deal II as spelled

out in Treibacher's communications.  (Testimony of Peter Hinterhofer and John

Johnson)

**G.**   *TDY's concurrent acquisition of TaC.*

Until November and December, 2000, Treibacher was TDY's sole source for

TaC.  (Testimony of John Johnson)   As early as November 7, 2000, TDY was also in contact with the ELG company in search of the same product.  (Plaintiff's Ex. 55) This fact was not disclosed to Treibacher.  (Testimony of Peter Hinterhofer and John Johnson) On or about December 11, 2000, TDY placed an order with ELG for 1,350 pounds of TaC at a cost of $310.0571 per pound.  The purchase requisition states, "Please sign and return.  We bid this material through ELG to conceal our identity." And at the bottom is stated, "Savings $180k."  (Plaintiff's Ex. 56A-B; Testimony of John Johnson)

Also during this time frame TDY decided to pursue the raw material tantalum oxide to produce TaC.  (Conard Atchley testimony)  In April of 2001, TDY acquired 25,010 pounds of tantalum oxide.  (Plaintiff's Ex. 57, 58 and 59A-D; Testimony of John Johnson) In this transaction, TDY again used ELG as the go between to bid on this product.  TDY did not tell Treibacher that TDY was seeking tantalum oxide or that TDY had decided to manufacture its own TaC.  (Testimony of Peter Hinterhofer and John Johnson)

### H.    *Damages*.

Treibacher's damages arise from TDY's failure to pay for the quantities of TaC ordered by TDY, referred to as Deal I and Deal II, and also quantities of hard metal powders ordered and received by TDY in the last quarter of 2000, which TDY used

15

in part but has not paid for the unused balance.  These unused quantities of powders were ordered by Conrad Atchley through TDY's purchase orders and requisitions. (Plaintiff's Ex. 23, 24 and 25; Testimony of Peter Hinterhofer)

Also, quantities of TaC and TaC 50/50 arising out of Deal I were shipped, in part, to TDY.  These shipments are identified in Blanket Purchase Orders to Treibacher as executed by Conard Atchley stating the pricing of 500 kilograms of TaC at $925.00 per kilogram and 2,000 kilograms of TaC 50/50 at $492.50 per kilogram.  (Plaintiff's Ex. 35, 36 and 37)  These quantities of TaC and TaC 50/50, as referenced in the purchase orders to Treibacher, followed conversations and e-mails between Treibacher and TDY beginning on November 8, 2000, and culminating in a series of e-mails between Treibacher's agent, Peter Hinterhofer, and TDY's agent, Conard Atchley.  (Plaintiff's Ex. 29, 30, 31, 32, 34, 35, 36 and 37)  Following this series of e-mails, Treibacher ordered raw material from its supplier at a cost of $2,530,864.44.  ( Plaintiff's Ex. 33; Testimony of Peter Hinterhofer)

Concerning Deal II, TDY committed by telephone that it would accept Treibacher's offer to provide 2,000 kilograms of TaC at $1,100.00 per kilogram or, at TDY's choice, niobium carbide to be mixed with TaC to make TaC 50/50, which would be sold at a price of $580.00 per kilogram.  (Testimony of Peter Hinterhofer) Treibacher e-mailed TDY stating, "You confirmed to purchase 2,000 kilograms of

16

TaC contained in the quality (pure 50/50, etc.) of your choice for May, June and July, 2001 arrival." This confirmation quoted the price as $1,100.00 per kilogram. TDY failed to further respond to this e-mail. (Plaintiff's Ex. 40; Testimony of Peter Hinterhofer and John Johnson)  On December 15, 2000, Treibacher placed its order for the raw material needed to produce the TaC discussed in these transactions between Treibacher and TDY from December 7, 2000, through December 15, 2000. Treibacher's cost of material needed to produce these quantities of TaC or TaC 50/50 was $1,543,209.85.  (Plaintiff's Ex. 41; Testimony of Peter Hinterhofer)

Following the failure of TDY to purchase or take delivery of portions of the product referred to in Deal I and all of the product referred to in Deal II, Treibacher began to undertake to mitigate its damages.  Testimony of Treibacher's Commercial Director, Ulf Strumberger, and its Manager in charge of sales and purchasing, Peter Hinterhofer, illustrate Treibacher's efforts to mitigate its damages.  It began selling the TaC to other customers in 2001 and continued through 2002.  It received a total of $919,458.00 in total sales in its attempts to mitigate damages.  The sales price of the TaC and TaC 50/50 received and unused by TDY, not related to Deal I or Deal II, is $165,000.00.  (Testimony of Ulf Strumberger)  Under Deal I, Treibacher received part of this shipment but failed to take delivery of the remaining portion of the order.  The sales price of the product identified under Deal I was $2,987,500.00.

In Deal II, the combined value of the product ordered by TDY at the agreed negotiated price was $2,200,000.00. The combined total sales price of all of these transactions (Deal I, Deal II and the unused material ordered and received by TDY in the last quarter of 2000) was $5,361,500.00. After mitigation, Treibacher's damages, without applying interest, is $4,442,042.00. (Testimony of Ulf Strumberger; Plaintiff's Ex. 63)

Although Treibacher's mitigated its damages, its mitigation efforts did not occur, in part, until well into 2002. (Plaintiff's Exhibit 65-A through U) Treibacher would have mitigated earlier but for TDY's continuing representations, at least until July, 2001, that TDY would use the materials. (Testimony of John Johnson; testimony of Ulf Strumberger) Treibacher invoiced TDY for the materials at issue on November 30, 2001. Terms were net 30 days. (Plaintiff's Exhibit 62) Treibacher claims prejudgment interest from January 1, 2002.

## CONCLUSIONS OF LAW

1.      The Agreements Were Contracts for Sale.

The first question before the Court is, "Were the agreements at issue 'contracts for sale?'" The Court's answer to this question is, "Yes."

The evidence shows that TDY agreed to purchase, and Treibacher agreed to supply, the materials "on consignment." The course of dealings between the parties

18

establishes that this meant that the parties agreed on quantities and prices, with invoicing and payment delayed until TDY withdrew the materials and sent a usage report.  While there was evidence that, <u>within the United States hard metals market</u>, the trade usage of the term "consignment" meant that there was no obligation to pay for materials unless and until they were withdrawn from consignment (Testimony of Robert Weiser and John Johnson), and although the evidence is uncontroverted that title to the materials did not pass from Treibacher to TDY until the materials were withdrawn, the testimony of TDY's corporate representative, John Johnson, was that each consignment agreement was negotiated individually.  Turning therefore to the "individually" negotiated agreement between these parties, and noting that the parties stipulated that they never discussed the meaning of the term "consignment", the Court looks to the course of dealings between <u>these</u> <u>parties</u>.  The CISG provides**:**

*Article 8: (1) For the purpose of this convention statements made by and other conduct of a party are to be interpreted according to his intent where the other party knew or could not have been unaware what that intent was.*

*(3) In determining the intent of the party or the understanding of a reasonable person would have had, due consideration is to be given to all relevant circumstances of the case including the negotiations, any practices which the parties have established between themselves, usages and any subsequent conduct of the parties.*

*Article 9: (1) The parties are bound by any usage to which they have agreed and by any practices which they have established between themselves.*

*(2) The parties are considered, unless otherwise agreed, to have impliedly made applicable to their contract or its formation a usage of which the parties knew or ought to have known and which in international trade is widely known to and regularly observed by parties to contracts of the type involved in the particular trade concerned.*

**Article 11:** *A contract of sale need not be concluded in or evidenced by writing and is not subject to any other requirements as to form.  It may be proved by any means, including witnesses.*

**Article 23:** *A contract is concluded at the moment when an acceptance of an offer becomes effective in accordance with the provisions of this convention.*

**Article 24:** *For the purposes of this part of the convention, an offer, declaration of acceptance or any other indication of intention "reaches" the addressee when it is made orally to him or delivered by any other means to him personally, to his place business or mailing address or, if he does not have a place of business or mailing address, to his habitual residence.*

The uncontroverted course of dealings between these parties established that the parties entered into verbal and written agreements for materials **and that all of the products at issue in this case were agreed.**[1]  The issue between the parties is whether, under their agreement, TDY was obligated to consume (and therefore obligated to pay for) the goods at issue.  It is uncontroverted that, as between these parties, the course of dealing established that once delivered, the materials could not be returned to TDY; rather, TDY had to use and pay for them.  (Plaintiff's Exhibit 27;

---

[1] However, TDY vigorously assets that the agreement was for "consignment" and further that, because the "qualities" (i.e. specifications) for the goods agreed to on December 14, 2000, were never specified by TDY, no contract was formed as to those goods.

Testimony of Peter Hinterhofer and Conard Atchley) Further uncontroverted testimony is that Treibacher told TDY that Treibacher would not purchase the necessary raw materials to supply the November 14, 2000, and December 14, 2000, orders unless TDY made a firm commitment to buy.   (Testimony of Peter Hinterhofer) Further, TDY never informed Treibacher, during the post-December 14, 2000, communications between the parties, that TDY would not use all of the materials that had been delivered or that TDY would not specify qualities for and take delivery of the materials that had been ordered on December 14, 2000.

As stated in TDY's trial brief, "[t]he question before the Court is not how the law defines 'consignment,' but what the parties meant when they used that word.  *See, e.g., A.I.G. Uruguay Compania de Seguros v. AAA Cooper Transportation*, 334 F.3d 997, 1010 (11th Cir. 2003) ("'[T]he parties to a contract have the right to define the terms of that contract.') (citation omitted)"  Applying the law to the facts of this case, the Court finds that these parties meant to enter into a contract to sell, with transfer of title and payment deferred until withdrawal, such withdrawal to occur within a (mutually agreed) reasonable time .

     2.     The CISG Applies to the Agreements.

The parties agree that the United Nations Convention on Contracts for the International Sale of Goods ("CISG"), 15 U.S.C. App. (2005) applies to contracts for

the sale of goods between these parties.  Additionally, the CISG itself states that it "applies to contracts of sale of goods between parties whose places of business are in different states: (a) when the States are Contracting States. . .".  CISG art. 1(1)(a); *see also MCC - Marble Ceramic Center, Inc. v. Ceramia Nuova D'Agostino, S.P.A.*, 144 F.3d 1384, 1386 (11th Cir. 1998), *cert. denied*, 526 U.S. 1087 (1999).  Treibacher's place of business is in Austria; TDY's place of business is in the United States.  Both Austria and the United States are Contracting States.  Also, the CISG "governs . . . the formation of the contract of sale and the rights and obligations of the seller and the buyer arising from such a contract."  CISG art. 4.  Thus, the CISG applies to, and governs, these agreements.

3.      TDY Breached the Agreements.

The elements of breach of contract are: (1) existence of a contract between plaintiff and defendant; (2) performance by the plaintiff; (3) defendant's failure to perform; and (4) resulting damages to the plaintiff.  *Weaver v. New Holland Credit Co.*, 812 So.2d 1265 (Ala. Civ. App. 2001).  The Court has found that the agreements were contracts.  It is undisputed that: (1) TDY has received materials from Treibacher and has failed to pay for some of those materials; (2) Treibacher ordered materials in order to be able to supply TDY other materials; and (3) TDY has refused to accept delivery/specify content of/pay for those materials.  The evidence is also undisputed

22

that Treibacher has been damaged by TDY's refusal in the amount of $4,442,042, after mitigation sales. Treibacher is therefore entitled to judgment on its breach of contract claims.

4.     TDY Committed Promissory Fraud.

Until November, 2000, Treibacher had been TDY's sole source of the materials at issue. However, at least as early as November 7, 2000, TDY began looking for another source of materials. TDY did not inform Treibacher of this fact. In fact, TDY used an intermediary company to bid on raw materials (to be used by TDY to produce the materials previously purchased solely from Treibacher) in order "to conceal [its] identity." (Plaintiff's Exhibit 5; Testimony of John Johnson)

Under Alabama law, "[a] claim of promissory fraud requires proof of six elements: (1) false representation, (2) of a material existing fact, (3) that is justifiably relied upon by the plaintiff, (4) that causes damage to the plaintiff as a proximate result of the reliance, (5) 'proof that at the time of the misrepresentation, the defendant had the intention not to perform the act promised,' and (6) 'proof that the defendant had an intent to deceive.'" *Triple J Cattle, Inc. v. Chambers*, 621 So.2d 1221, 1224 (Ala. 1993) (quoting *Padgett v. Hughes*, 535 So.2d 140, 142 (Ala. 1988). Treibacher relies on the case of *Hillcrest Center, Inc. v. Rone*, 711 So.2d 901 (Ala. 1997) for its promissory fraud claim. In *Hillcrest*, the Alabama Supreme Court held

that a promise to perform based on an undisclosed contingency, which is intended to induce reliance upon the promise, is sufficient evidence for a trier of fact to infer the intent required to support a promissory fraud claim. *Id.* at 905-06.  Although  John Johnson testified that the reason that TDY concealed its identity was to keep TDY's <u>customers</u> from learning the prices that TDY was paying, Treibacher need not disprove that testimony in order to prevail.  It is undisputed that TDY in fact failed to disclose to Treibacher the facts that it was seeking to purchase raw materials elsewhere and to begin manufacturing its own product.  This failure, in light of:

> - the undisputed testimony and evidence that TDY knew, on November 14, 2000, and on December 14, 2000, that Treibacher would not purchase raw materials to supply TDY unless TDY made a "firm commitment,"; and

> - the fact that TDY used only part of the November 14, 2000, order; and

> - TDY's failure to respond regarding the December 14, 2000, order; and

> - TDY's silence keeping Treibacher "on the hook"[2] to deliver under both orders while TDY went out and established a cheaper supply,

causes the Court to conclude that TDY intended, from the beginning, at least as to the November and December, 2000, transactions, to induce Treibacher to enter into the sales agreements, yet TDY never intended to honor the agreements unless TDY was unable to locate a cheaper source before it needed to use the materials ordered.

---

[2]  The Court's characterization, not a quote from trial testimony.

Additionally, as conceded by Defendant in its Brief in Support of Motion to Reconsider Amendment of Pleadings ... (Doc. 75), "the parties' post-December 2000 conduct is relevant in determining the parties' intent in entering into the alleged agreement." (Defendant's Brief, at p. 10.)  The Court finds that the post-December 2000 communications from TDY indicating that TDY would take and use the materials, and the failure of TDY to disclose its intention <u>not</u> to take or use the materials, is evidence that TDY never intended to take and use the materials unless TDY failed to find a cheaper source (an undisclosed contingency).  Thus, Treibacher has established all six elements of promissory fraud, including TDY's intent.  *See*, *Hillcrest Center, Inc.*, 711 So.2d at 906.

     4.    Damages.

Treibacher has sought compensatory damages under each of its claims.  The Court finds that each claim supports a claim for compensatory damages.  CISG art. 74 provides:

> Damages for breach of contract by one party consist of a sum equal to the loss, including loss of profit, suffered by the other party as a consequence of the breach.  Such damages may not exceed the loss which the party in breach foresaw or ought to have foreseen at the time of the conclusion of the contract, in the light of the facts and matters of which he then knew or ought to have known, as a possible consequence of the breach on contract.

The measure of damages as provided under CISG art. 74 is similar to damages

allowed for breach of contract in the State of Alabama.  Damages for breach of contract in the State of Alabama are such damages that are the natural and proximate consequences of the breach, and such as may reasonably be supposed to have been within the contemplation of the parties at the time the contract was made.  *Aldridge v. Dolbeer*, 567 So.2d 1267 (Ala. 1990).  In applying the provisions of CISG, the Court is mindful that a Federal Court sitting in diversity jurisdiction must apply the substantive law of the state in which it sits, including its choice of law.  *Chicago Prime Packers, Inc. v. Northam Food Co.*, 320 F.Supp.2d 702, also citing *Land v. Yamaha Motor Corp.*, U.S. 272 F.3d 514, 516 (7th Cir. 2001) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)).

Clearly, TDY ordered quantities of material from Treibacher.  TDY knew that Treibacher had to special order raw materials with which to produce the TaC to be shipped to TDY pursuant to its purchase orders.  TDY also knew and could reasonably foresee that the cost to Treibacher in order to acquire these raw materials would fluctuate.  It also could reasonably foresee that its failure to receive and pay for the TaC at prices it had agreed upon with Treibacher would cause Treibacher to suffer damages in the form of costs to acquire the material to produce the TaC and in the form of lost profits.  It was well within the contemplation of Treibacher and TDY that TDY would pay the purchase price after receipt and usage by TDY.  The conduct

of the parties over the years establishes that it was further within the contemplation of the parties that TDY would ultimately have to use and pay for the product, not having a right to return or reject acceptance of the same.[3]  After mitigation through the sale of portions of the unused product, Treibacher suffered damages in the amount of $4,442,042.00.

> The CISG provides:
>
> Damages for breach of contract by one party consist of a sum equal to the loss, including loss of profit, suffered by the other party as a consequence of the breach. Such damages may not exceed the loss which the party in breach foresaw or ought to have foreseen at the time of the conclusion of the contract, in the light of the facts and matters of which he then knew or ought to have known, as a possible consequence of the breach of contract. CISG, Art. 74. This provision is 'designed to place the aggrieved party in as good a position as if the other party had properly performed the contract.'

*Delchi Carrier SpA v. Rotorex Corp.,* 71 F.3d 1024, 1029 (2nd Cir. 1995).

Treibacher claims interest thirty (30) days from the date all unused or unreceived product was invoiced, which date is November 30, 2001.  Again, this Court is instructed by *Chicago Prime Packers, Inc. v. Northam Food Trading Co.*, *supra*.  The Court also recognizes that interest on damages for breach of contract is allowed under CISG art. 78 which provides that:

---

[3]  Put another way, the "usage" aspect of the parties' contractual dealings was a matter of payment timing or convenience, not a contractual prerequisite.

> **Article 78**:If a party fails to pay the price or any other sum that is in arrears, the other party is entitled to interest on it, without prejudice to any claim for damages recoverable under art. 74.

The Court, in *Chicago Prime Packers*, interpreted Art. 78 of the CISG to "entitle [the prevailing seller] to prejudgment interest." *Id*. at 715

> The CISG further provides that "[i]f a party fails to pay the price or any other sum that is in arrears, the other party is entitled to interest on it, without prejudice to any claim for damages recoverable under article 74. CISG, Art. 78.
>
> ***
>
> However, Article 78 does not specify the rate of interest to be applied or how the rate should be determined ....

*Id*.  The Court noted the numerous reported cases discussing the issue of prejudgment interest and how it should be calculated under the CISG and held:

> [B]ecause there is no single approach used by all courts and the parties have failed to address the interest issue or provide information necessary to "customize" a rate, this court will award interest according to the principles used by federal courts in determining choice of law issues. It is well-settled that "[a] federal court sitting in diversity jurisdiction must apply the substantive law of the state in which it sits," including its choice of law.  (Citations omitted)

*Id*. at 715-716.

This Court finds the reasoning of *Chicago Prime Packers* persuasive.  As in *Chicago Prime Packers*, here the parties have failed to address the interest issue or provide information necessary to "customize" a rate.  This Court therefore will award interest according to Alabama state law regarding computing pre-judgment interest.

Under Alabama law,

All contracts, expressed or implied, for the payment of money, or other thing, or for the performance of any act or duty, bear interest from the day such money or thing, establishing it at its money value, should have been paid, or such act, estimating the composition therefore in money, performed.

§8-8-8, *Code of Alabama*, 1975, as amended.

The agreement between these parties has no provision for pre-judgment interest. Where no written contract controls the interest rate, "the legal rate of interest is 6%." *Burgess Mining and Construction Corp. v. Lees*, 440 So.2d 321, 338 (Ala. 1983).

Thus, under both Article 78 of the CISG and Ala. Code §8-8-8, Treibacher is entitled, under its breach of contract claim, to pre-judgment interest at six per cent (6%). Treibacher did not invoice TDY for the materials at issue until November 30, 2001. It is undisputed that the terms of the contract between the parties was "net 30 days." Treibacher is entitled to pre-judgment interest from January 1, 2002.

Treibacher's claim of fraud is brought under Alabama state law. As stated earlier, the Court finds that Treibacher has established all six elements of promissory fraud. Treibacher's damages flowing from the fraud are the compensatory damages already awarded under the breach of contract claim.

29

Accordingly, the Court will enter judgment in favor of Treibacher and against TDY in the amount of Four Million Four Hundred Forty-Two Thousand Dollars ($4,442,042.00) as compensatory damages, plus interest from January 1, 2002. Treibacher is to file a proposed Judgment Order containing a computation of such interest no later than fourteen (14) days of the entry of this Memorandum of Decision. Treibacher shall attach to such proposed order an affidavit detailing how such computation was made. TDY shall have fourteen (14) days from the Treibacher filing to object with specificity to the pre-judgment interest computation. TDY's objection, if any, is to include TDY's proposed calculation of pre-judgment interest. Such calculation will in no way waive any right of TDY to appeal the judgment of the Court in this case. The Court will hold a hearing, if necessary, on such computation of interest and thereafter will enter judgment.

**DONE** this 27th day of April, 2005.

**VIRGINIA EMERSON HOPKINS**
United States District Judge